IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIKEAL WOODEN-OUSLEY, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) No. 08 CV 3381 |
| -vs- | ) |
| | ) *(Judge Kocoras)* |
| CITY OF CHICAGO, et al., | ) |
| | ) |
| *Defendants.* | ) |

# PLAINTIFF'S RESPONSE TO
# DEFENDANT'S RULE 56.1 STATEMENT

Plaintiff submits the following pursuant to Rule 56.1(b)(3):

Contention: 1. The parties in this action are the plaintiff Mikeal Wooden Ousley; the defendants Chicago Police Detective Julie Mendez and Chicago Police Officers Joseph Corona and Oscar Serrano, and the City of Chicago. The complaint makes claims against defendants pursuant to 42 U.S.C. §1983, and the court therefore has jurisdiction over the case pursuant to 23 U.S.C. §§1331, 1343 and 1367. As all of the alleged underlying events took place in the City of Chicago, and as the defendants are all residents of the Northern District of Illinois, venue is proper within the Northern District of Illinois.

Response: Agree.

Contention: 2. Mendez was a detective employed by the City of Chicago from May, 2003 until her retirement in 2009.

Response: Agree.

Contention: 3. Joseph Corona is a police officer employed by the City of Chicago. He has been employed as a police officer since September, 2004.

Response: Agree.

Contention: 4. Oscar Serrano is a police officer employed by the City of Chicago. He has been employed as a police officer for seven years.

Response: Agree.

Contention: 5. Prior to April 2006, Maria Gutierrez sold a Chevy van, signing the title over to the purchaser.

Response: Disputed. Title was held in the name of David Gutierrez. (Exhibit 1, 44:5-15.)

Contention: 6. Brian Brosnan, then a Chicago Police Officer assigned to the 13th District, was on duty on April 15, 2006, when he and his partner saw a Chevy van without license plates or registration.

Response: Agree.

Contention: 7. Brian Brosnan saw one occupant in the driver's seat of the van which was parked on the south side of the street with the engine running.

Response: Disputed. Brosnan claims that he found a man sitting in a car that did not have license plates, but had a peeled steering wheel, and that the man could not prove ownership of the vehicle. If, as Brosnan claims, the man identified himself as Mikeal Wooden-Ousley, that man did not have a valid driver's license. That Brosnan did not arrest the occupant of the apparently stolen vehicle is inherently incredible.

Contention: 8. The occupant of the van was asked for identification and provided a driver's license identifying him as Mikeal Wooden Ousley.

Response: Disputed. See response to contention 7 above.

Contention: 9. Brian Brosnan had the van towed for investigative purposes because he and his partner couldn't verify ownership of the van, there were no plates on the van and a VIN check did not reveal ownership.

Response: Agree.

Contention: 10. Brian Brosnan and his partner generated a tow report for the vehicle which included the name of the occupant of the vehicle, Mikeal Wooden Ousley, his address and driver's license number.

Response: Agree that the two report contains this information; disputed that the occupant of the vehicle was Mikeal Wooden Ousley, and that his driver's license number was the number shown on the tow report. Plaintiff's Additional Facts 17.

Contention: 11. [a] Maria Gutierrez' mother-in-law called her to tell her that there was an envelope in her mailbox with Maria's name on it. [b] The envelope contained the title to the van. [c] Maria got scared and went to the police station where she learned the van was impounded.

Response:

[a] Motion to strike: hearsay.

[b] Disputed. Exhibit 17, Mendez Dep. 26 (Gutierrez told Mendez that she had received "a tow report stating that the case was towed")

[c]   Disputed.  Exhibit 5 ("calls police. Police say car was towed to Sacramento pound")

Contention:    12. Maria Gutierrez attempted to call the buyer regarding the impoundment but received no response.

Response: Disputed. The car was impounded at about 4:00 a.m. on April 15, 2006 and retrieved from the pound by David Gutierrez at 3:36 p.m. that day. (Exhibit 9.)  The claim of Maria Gutierrez that she tried to telephone the "buyer" of the van "several times" before her husband retrieved the van (Exhibit 1 at 22-23.)  is incredible.

Contention:    13. Maria Gutierrez paid to get the van out of the pound and gave it to her sister Christina.

Response: Disputed. Towing and storage charges were paid by David Gutierrez. (Exhibit 10.)

Contention:    14. Christina's surname is Salgado.

Response: Agreed.

Contention:    15. On May 19, 2006, Jorge Palomino was driving the van on Roosevelt Road. In the van were his girlfriend Christina Salgado, his daughter, his mother-in-law and his mother-in-law's boyfriend.

Response: Agreed, although at various times in the record Christina Salgado is referred to as the wife of Jorge Palomino. (Exhibit 1 at 59, 60, 77.)

Contention:    16. At the intersection of Central Park and Roosevelt a vehicle with four occupants pulled alongside the van and honked.

Response: Agreed.

Contention: 17. There was a "for sale" sign on the van and one of the occupants of the vehicle asked the price of the van.

Response: Agreed.

Contention: 18. Christina Salgado told the occupants of the car the price of the van. A passenger told her that it wasn't true, the van was his.

Response: Agreed.

Contention: 19. The driver of the car pulled the car in front of the van to block the van.

Response: Agreed.

Contention: 20. A male passenger of the car exited the car and pointed a gun at Palomino's head, telling him to get out of the van.

Response: Agreed.

Contention: 21. The male climbed into the driver's seat of the van and pointed the gun to Christina Salgado's face.

Response: Agreed.

Contention: 22. Christina Salgado got out of the van.

Response: Agreed.

Contention: 23. The man drove off in the van.

Response: Agreed.

Contention: 24. P.O. Joseph Corona and his partner were assigned to respond to a call of a robbery at 3558 W. Roosevelt.

Response: Disputed. The robbery was reported to have occurred at Central Park and Roosevelt Road. (Exhibit 1 at 189.) The officers found the alleged victims of the robbery two blocks west, at 3558 West Roosevelt Road. (Plaintiff's Exhibit 2 at 1.)

Contention: 25. P.O. Corona obtained a description of the offenders from the victims. The male offender was described as a male who is 20 to 29 years of age, 5' 9", weighing 145 pounds.

Response: Agreed.

Contention: 26. Officer Corona wrote in his case report narrative that the victims related to the reporting officers that the offender asked "how much are you selling that car for?" and that the offender responded "hell no. That's bullshit. That's my car." in response to the amount given.

Response: Agreed.

Contention: 27. Maria Gutierrez arrived on the scene and told Officer Corona that she had sold the van to an unknown male a few months prior.

Response: Agree.

Contention: 28. Officer Corona did not see any offenders or any persons identified as offenders on the scene on May 19, 2006.

Response: Agreed.

Contention: 29. Detective Mendez was assigned to investigate the robbery.

Response: Agreed.

Contention: 30. Detective Mendez spoke with Maria Gutierrez. Maria Gutierrez told Mendez that she had owned the van previously, had sold the van to a Mikeal Ousley, had later gotten the van back and loaned it to her sister Christina Salgado.

Response: Disputed. When the first officers responded to the carjacking, Gutierrez told them that she did not know the name of the person to whom she had allegedly sold the van. Additional Facts, par. 5. Gutierrez similarly told Detective Mendez that "she does not remember his name." Additional Facts, par. 39(c). A reasonable inference is that Mendez told Gutierrez the name of the person referred to in the two report and then showed a photograph of that man to Gutierrez.

Contention: 31. Detective Mendez pulled the tow report generated by Brian Brosnan on April 15, 2006, which listed the van occupant as Mikeal Wooden-Ousley.

Response: Agree.

Contention: 32. Detective Mendez showed Maria Gutierrez a photograph of Mikeal Wooden Ousley who Gutierrez then identified as the person to whom she had sold the van.

Response: Agree.

Contention: 33. Detective Mendez caused a Chicago Police Department computer to generate a photo array which included Mikeal Wooden Ousley.

Response: Agree.

Contention: 34. To obtain the photo array Detective Mendez entered the Mikeal Wooden Ousley's information, his name, height and weight, into the computer and the computer generated pictures with people that looked like him.

Response: Agree.

Contention: 35. The photo array was comprised of head shots of six individuals.

Response: Agree.

Contention: 36. Christina Salgado and Jorge Palomino were each separately shown the photo array.

Response: Disputed. Plaintiff's Additional Facts, par. 29.

Contention: 37. Christina Salgado was shown the photo array and identified Mikeal Wooden Ousley as the male offender.

Response: Agreed.

Contention: 38. Jorge Palomino was shown the photo array and identified Mikeal Wooden Ousley as the male offender.

Response: Agreed.

Contention: 39. Detective Mendez told Officer Oscar Serrano that Mikeal Wooden Ousley was positively identified as one of the offenders.

Response: Agreed.

Contention: 40. Officer Serrano and his partner, Officer Sandoval, were working under the direction of Detective Mendez when they arrested Mikeal Wooden Ousley.

Response: Agreed.

Contention: 41. Mikeal Wooden Ousley is six feet, six inches tall.

Response: Disputed. Plaintiff is six feet, seven inches tall. Exhibit 7.

Contention: 42. Mikeal Wooden Ousley told Mendez that he did not buy a van from Maria Gutierrez.

Response: Agreed.

Contention: 43. Mikeal Wooden Ousley was put into a physical lineup.

Response: Agreed.

Contention: 44. Maria Gutierrez identified Mikeal Wooden Ousley in the physical lineup as the person to whom she sold her van.

Response: Agreed.

Contention: 45. Christina Salgado and Jorge Palomino each individually viewed the lineup and identified Mikeal Wooden Ousley in the physical lineup as the person who took money and the van from them.

Response: Disputed. Additional Facts, par. 35.

Contention:       47. The assistant state's attorney approved charges against Mikeal Wooden Ousley.

Response: Agreed.

Contention:       48. Mikeal Wooden Ousley was charged with five counts of aggravated vehicular hijacking with a weapon, 720 ILCS 5/18-4(a)(3); one count of aggravated vehicular hijacking/passenger under 16 years of age, 720 ILCS 5/18(-4(a)(2); armed robbery, 720 ILCS 5/18-2(a); two counts of attempted armed robbery, 720 ILCS 58-4; five counts of unlawful vehicular invasion, 720 ILCS 5/10-3.1(a); and five counts of aggravated unlawful restraint, 720 ILCS 5/10-3.1(a).

Response: Agreed.

Contention:       49. The grand jury returned a direct indictment of Mikeal Wooden Ousley.

Response: Agreed.

Contention:       50. Officer Corona was called as a witness for the defense [at trial].

Response: Agreed.

Contention:       51. Officer Corona had no contact with Wooden Ousley prior to his trial and no involvement in the investigation of the robbery.

Response: Agreed.

Contention:       52. Mikeal Wooden Ousley was found not guilty at trial.

Response: Agreed.

Contention:         53. Wooden Ousley stated that the exculpatory evidence withheld from the court and the jury was his identity and the difference in height between the perpetrator and him.

Response: Motion to Strike: plaintiff's personal view of his legal claims is not material.

### PLAINTIFF'S ADDITIONAL FACTS

1. Officer Corona learned from Christina Salgado and Jorge Palomino (referred to in Corona's report as "George Salgado"), two of the alleged victims, that they had been in their 1993 Chevrolet Van driving westbound on Roosevelt Road. (Exhibit 2 at 1.) Also in the van were Felipa Salgado (Christina's mother), Aranda Platas (Felipa's boyfriend), and Christina's daughter, five year old Palomino. Id.

2. The Pontiac then pulled in front of the Salgado vehicle and the male passenger emerged from the Pontiac holding a blue steel handgun. (Exhibit 2 at 2.) The male passenger pointed his gun at George Salgado and ordered him out of the van. (Exhibit 2 at 2.)

3. Jorge told the officers that the man with the gun took eight hundred dollars from his right jacket pocket. (Exhibit 2 at 2.)

4. The van was recovered about two blocks west of the carjacking and returned to Christina Salgado. (Exhibit 2 at 2.)

5. Maria Gutierrez, Christina's sister, arrived on the scene and told Officer Corona (Exhibit 2 at 2): "that she was the previous owner of vehicle taken and had sold it to an unk[nown] M/I/20's a few

months prior. Gutierrez, M. also related that unk[nown] M/I/20's phone# was (773) 440-4542 and that he was arrested on 15APR065 at Wash/Pulaski."

6. On May 30, 2006, a woman named Kimberly White was taken into custody by Chicago police officers. (Exhibit 16 at 3-4.) White had been implicated in a carjacking. (Exhibit 16 at 3-4.)

7. Chicago police detectives Mendez nd Civas interviewed White at 3:15 p.m. on May 30, 2006. (Plaintiff's Exhibit 16 at 4.) White confessed to an armed robbery and carjacking that had occurred on March 28, 2006, but demanded an attorney when the detectives questioned her about the April 15th carjacking involved in this case. (Exhibit 16 at 5.)

8. After speaking with White on May 30, 2006, the detectives spoke by telephone (Exhibit 17, Mendez Dep. 19) with Jorge Palomino and Christine Salgado. (Exhibits 3, 4.) Jorge spoke in broken English. (Exhibit 17, Mendez Dep. 33.) Neither of the detectives speaks Spanish. (Exhibit 17, Mendez Dep. 17.)

9. The detectives did not record any additional information from Jorge or Christine about the physical appearance of the offenders. (Exhibits 3, 4.)

10. Jorge and Christine provided the detectives with slightly different details about the alleged carjacking:

   a. Jorge told Detective Mendez that the offender had taken $980 from him (rather than $1000), and that he (rather than Christine), had informed the offender that the asking

price for the van was $1,000. (Exhibit 3.)

    b. Christine told Detective Civas that she had responded to the question about the asking price by stating "$1200.00." (Exhibit 4 at 1.) Christine also described the offender's firearm as a "black auto" (Exhibit 4 at 1), rather than the "blue steel" handgun referred to in the original report. (Exhibit 2 at 2.)

11. Detective Mendez added the following to the report summarizing the detectives' conversation with Christina Salgado: "Sister sold van to a black man she does not know name police towed van." Exhibit 4 at 1.

12. At 4:08 a.m. on April 15, 2006 (Exhibit 6 at 1), Chicago Police Officer Brosnan observed a 1993 Chevy Van without license plates parked on the street at 2565 West Washington Avenue. (Exhibit 1 at 49.)

13. The engine was running. Id. The steering column was "peeled." (Exhibit 6 at 2.)

14. Brosnan claims that he or his partner approached the man sitting in the driver's seat, id., and requested the man to display his driver's license. (Exhibit 1 at 50.)

15. Brosnan wrote in his report that the man sitting in the driver's seat of the van handed him an Illinois driver's license, number W35254382257, bearing the name of Mikeal Wooden-Ousley and showing a home address of 4449 West Washington Boulevard. (Exhibit 1 at 50-51.) Brosnan testified at trial that he matched

the picture on the driver's license with the face of the man in the van. (Exhibit 1 at 50.)

16. Notwithstanding the "peeled" steering column and the absence of license plates, Brosnan did not arrest the driver. (Exhibit 1 at 53, 57.) (Defendant Mendez answered "I don't recall" when asked if she or her partner had ever asked Officer Brosnan why he had not arrested the driver. Mendez Dep. 17.)

17. Plaintiff did not have an Illinois driver's license in April of 2006. Records from the Illinois Secretary of State (Exhibit 7) show that plaintiff's driver's license expired on December 9, 2003, that his license had been suspended for a three year term on October 7, 2003 and then for an indefinite term on July 6, 2005. (Exhibit 7 at 2.)

18. The van arrived at the tow lot at 08:02 on April 15, 2006. (Exhibit 8.) At 3:36 p.m. that day, David Gutierrez (the husband of Maria Gutierrez), appeared at the pound with a valid driver's license and the title to the van. (Exhibit 9.)

19. Gutierrez paid the towing and storage charges (Exhibit 10) and had the van towed from the lot at about 4:18 p.m. that day. (Exhibit 11.)

20. Thereafter, Gutierrez transferred the title of the 1993 Chevy Van to Christine Salgado. (Exhibit 1 at 44.) The transaction was dated February 26, 2006. Id.

21. Detective Mendez spoke with Maria Gutierrez on May 30, 2006. (Exhibit 5.) Mendez claims that Gutierrez stated that in April of

2006 she had sold the 93 Chevy van "to Ousley." Id Mendez wrote in her report that Maria Gutierrez had signed the title "open ended" and had not provided the buyer with a bill of sale. Id.

22. Gutierrez told Mendez that about two weeks after the sale, she had found the title to the vehicle in the mailbox. (Exhibit 5.)

23. Mendez testified at her deposition that Gutierrez had received "a tow report stating that the car was towed." Mendez Dep. 26.

24. After receiving the tow report, Maria Gutierrez drove to the police station at Grand and Central and learned that the car had been towed to the Sacramento pound. (Exhibit 1 at 22.)

25. The plaintiff Mikeal Wooden-Ousley was born on September 9, 1982. (Exhibit 7 at 1.)

26. In 2006, Mikeal was six feet seven inches tall and weighed slightly more than 200 pounds. (Exhibit 7 at 1.)

27. Mikeal obtained an Illinois driver's license, number W352-5438-2257, on March 10, 2001. (Exhibit 7 at 1.) Mikeal did not have a valid driver's license on April 15, 2006. (Exhibit 7.)

28. Detective Mendez obtained a photograph of plaintiff on May 31, 2006 at 3:08 p.m. (Mendez Dep. 28) and showed that photograph (Exhibit 12) to Maria Gutierrez on May 31, 2006. (Exhibit 1 at 24.) Mendez showed a single photograph to Gutierrez. (Mendez Dep. 31.)

29. Jorge Palomino viewed the "photo array" at about 4:35 p.m. (Exhibit 13) on May 31, 2006 in the company of Christina, Christina's mother, and his daughter. (Exhibit 1 at 79.)

30. According to Detective Mendez, she displayed the "photo array" at a fast food restaurant in Cicero. (Exhibit 1 at 34.)

31. Christina testified at trial that she went to the police station with her husband, daughter, and mother (Exhibit 1 at 121) to look at photographs. (Exhibit 1 at 106.)

32. Christina stated that she remained at the police station for about two hours (Exhibit 1 at 121), and that it took her between five and ten minutes before she could make identification from the photo array. (Exhibit 1 at 124.) Christina made her identification at about 4:30 p.m. (Exhibit 14.)

33. Plaintiff was exhibited in a lineup on June 13, 2006. (Exhibit 15.) He was wearing the same clothes as in the photograph that had been shown to the witnesses, i.e., a white T-shirt, and a gray hooded sweatshirt. (Exhibit 1 at 35-36.)

34. The lineup was viewed by Christina Salgado, Jorge Palomino, Maria Gutierrez, and Felipa Salgado. (Exhibit 15 at 5; Exhibit 1 at 125.)

35. Before the lineup, Detective Mendez told the witnesses that a suspect was in custody (Exhibit 1 at 125); the witnesses viewed the lineup together. (Exhibit 1 at 82-83.)

36. Maria Gutierrez identified plaintiff as "[t]he same guy that I sold the van to." (Exhibit 1 at 25.)  Christina Salgado required "five minutes" to identify plaintiff.  (Exhibit 1 at 126.)

37. Plaintiff told Mendez that he had "never bought a car" from Maria Gutierrez and that the officers had the "wrong guy." (Mendez Dep. 46.)

38. Mendez stated that her investigation of this claim of innocence consisted of the following:  "I talked to Maria Gutierrez who told me what we just discussed, that I showed her the [47] picture. She said he is the one that bought her car."  (Mendez Dep. 46-47.)

39. Detective Mendez prepared an eight page closing report. (Exhibit 15.)

    a. The report stated that the van belonged to Maria Gutierrez. (Exhibit 16 at 5.)

    b. The report also included the following about the earlier "sale" of the van: SALGADO related a few months prior her sister Gutierrez, Maria sold the Chevrolet Van to a black man. SALGADO related the police stopped the black man while he was driving the van and towed the van because the title was not signed. SALGADO related her sister Maria told her she found the title to the van in her mailbox.

    c. The report included the following summary of information provided to Mendez by Maria Gutierrez (Exhibit 16 at 7):

    GUTIERREZ stated several months ago her and her husband sold their Chevrolet Van to a black man. GUTIERREZ related she does not remember his name. Gutierrez further related she did not give the man a bill of sale nor did he ask for one. GUTIERREZ stated the man paid 500.00 for the van. A few weeks later GUTIERREZ finds the title of the van and a tow slip in her mail box. GUTIERREZ stated she calls the police and they tell her the van was towed to the Sacramento Auto pound. GUTIERREZ stated she tried to contact the man who bought the car but he never returned her calls. GUTIERREZ stated she went to the pound and paid the towing fee. GUTIERREZ related she has been lending the van to her sister because she does not have a car.

d.  According to the summary report, Mendez and her partner conducted a "further investigation" and learned that the van "previously belonging to GUTIERREZ was towed on 15 April 2006 and OUSLEY, Mikeal C. was driving the van." (Exhibit 16 at 7.)

                                                */s/ Kenneth N. Flaxman*

KENNETH N. FLAXMAN
ARDC No. 830399
200 S Michigan Ave Ste 1240
Chicago, IL 60604-2430

(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

*attorney for plaintiff*